UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JTH TAX, INC. d/b/a LIBERTY
TAX SERVICE,

                    Plaintiff,

v.                                        ACTION NO: 2:05cv69

PHILIP T. CHARON and SOUTHWEST
TAXPREP, LTD.,

                    Defendants.

<u>OPINION AND ORDER</u>

      This matter is before the court on plaintiff JTH Tax, Inc.'s
d/b/a/ Liberty Tax Service ("Liberty") motion for partial summary
judgment.   For the reasons stated below, the court **GRANTS**
plaintiff's motion for partial summary judgment.

## I. Factual and Procedural History

      Liberty is a national tax preparation franchisor incorporated
in Delaware with its corporate headquarters and principal place of
business in Virginia Beach, Virginia.   Compl. ¶ 1, at 1.
Defendant Southwest TaxPrep, Ltd. ("Southwest") is a Texas
partnership with its principal place of business in Texas.   Id. ¶
5, at 2.   Defendant Philip T. Charon ("Mr. Charon") is a Texas
citizen, a general partner of Southwest, and the "architect" of
Southwest.   Id. ¶¶ 4-5, at 2; Pl.'s Mem. Supp. Mot. Partial Summ.
J. ¶ 2, at 3.   Defendants are collectively referred to as
"Southwest" unless otherwise specified.

On September 14, 2001, Liberty entered into nine (9) separate franchise agreements with Mr. Charon, who entered into the agreements on behalf of Southwest.  Pl.'s Mem. Supp. Mot. Partial Summ. J. ¶ 19, at 6.  The agreements granted Southwest the right to operate Liberty Tax Service offices in various Texas territories. Compl. Ex. 8, at 3.  This dispute arises out of statements and omissions that Liberty made in the four months preceding the execution of the franchise agreements[1] and the obligations imposed on the parties by the agreements.

In May, 2001, Mr. Charon had a telephone conversation with Mr. Dennis Stuver ("Mr. Stuver"), who identified himself as a Liberty Tax franchisee working in franchise development.  Countercl. ¶ 5, at 2.  During this conversation, Mr. Stuver told Mr. Charon that his Liberty Tax Service office completed 1100 tax returns in its first year and 1900 returns in its second year.  Id. ¶ 6, at 2; Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 9 (Defs.' Resp. Pl.'s Interrogs.), at 8.  On June 22-23, 2001, Mr. Charon attended a Liberty Tax Service franchise sales meeting in Virginia Beach, Virginia.  Countercl. ¶¶ 7-9, at 2-3.  At this meeting, Mr. Stuver repeated the above statement when Mr. Charon asked him for information on the profitability of Liberty Tax Service franchises.

---

[1] Every misrepresentation allegedly made by Liberty to Southwest for which Southwest is seeking relief was made on or between May, 2001, and August, 2001.  Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 9 (Defs.' Resp. Pl.'s Interrogs.), at 7-8.

Id. ¶ 9, at 3.   Also, during this meeting, Liberty's CEO John
Hewitt ("Mr. Hewitt") made several statements to attendees
including the following:  1) H & R Block tax preparation offices
completed an average of 2000 tax returns in 2001 and that number
would increase to 2200 tax returns in 2002; 2) franchisees should
assume that each desk in an H & R Block office prepares 300-400 tax
returns and should locate their Liberty Tax Service offices in the
territories with the most H & R Block desks; 3) franchisees should
plan to spend $30 in advertising per tax return prepared; and 4)
prospective franchisees can expect to prepare forty percent (40%)
of the number of tax returns prepared by the nearest H & R Block
office in their first year, if they follow the Liberty system.
Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 9 (Defs.' Resp. Pl.'s
Interrogs.), at 7-8.   In late June and early July of 2001, Mr.
Stuver provided Mr. Charon with expenses and revenue data per
return for Mr. Stuver's Liberty Tax Service office.  Id. Ex. 9
(Defs.' Resp. Pl.'s Interrogs.), at 8.[2]

_____

[2] For the purposes of this motion only, Liberty does not
dispute that Liberty representatives made these statements in the
four months preceding the execution of the franchise agreements.
Pl.'s Mem. Supp. Mot. Partial Summ. J. at 9 n.6 ("Liberty does not
take issue with the alleged misrepresentations because assuming,
arguendo, such statements were made and were misleading, Liberty
is still entitled to summary judgment for the reasons set forth
herein"); Pl.'s Reply Mem. Supp. Mot. Partial Summ. J. at 4
("Liberty has admitted, for the purposes of this motion only, the
allegations made by defendants regarding the alleged
misrepresentations and alleged omissions in the Counterclaim").
Moreover, for the purposes of this motion only, Liberty does not
dispute that Liberty did not furnish Southwest with a written

The nine (9) separate Franchise Agreements that Liberty and Southwest executed on September 14, 2001, contained the following provisions relevant to this motion:

## 10.   COVENANT NOT TO COMPETE

**b.**   **Post-Term.**  You agree that for a period of two (2) years following the termination, expiration, transfer or other disposition of the Franchised Business, you will not directly or indirectly, be employed by, work with, be engaged in, be interested in or advise, invest or contribute money to, lend money to or guarantee the debts or obligations of, any person or entity engaged in tax return preparation . . . .

## 15.   GOVERNING LAW

**a.**   **Virginia Law.**   This Agreement is effective upon its acceptance in Virginia by our authorized officer. Virginia law governs all claims which in any way relate to or arise out of this Agreement or any of the dealings of the parties hereto . . . .

**b.**   **Jurisdiction and Venue.** . . . In any suit brought against us, including our present and former employees and agents, which in any relates to or arises out of this Agreement, or any of the dealings of the parties hereto, venue shall be proper only in the federal court located nearest our National Office (presently the U.S. District in Norfolk, Virginia), or if neither federal subject matter or diversity jurisdiction exists, in the city or

---

document(s) setting forth the above representations along with any material bases and assumptions underlying the representations. Pl.'s Reply Mem. Supp. Mot. Partial Summ. J. at 4.  Southwest did receive Liberty's 2000 Offering Circular on June 23, 2001, and Liberty's 2001 Offering Circular on August 1, 2001.  Pl.'s Mem. Supp. Mot. Summ. J. Ex. 8.  The 2000 Offering Circular did not contain any information regarding the actual or potential sales, costs, income, or profits of a Liberty Tax Service franchise.  <u>Id.</u> Ex. 6.  The 2001 Offering Circular did provide information on income and expenses on certain Liberty Tax Service offices and stated that substantiation of the income and expense information was available upon request.  <u>Id.</u>

county state court located where our National Office is (presently the City of Virginia Beach, Virginia).

**17.   RELEASE OF PRIOR CLAIMS**

By executing this Agreement, the undersigned entity . . . , hereby forever release and discharge Liberty, its past and present employees, agents, officers and directors . . . ,from any and all claims relating to or arising out of any franchise agreement between the parties executed prior to the date of this Agreement, and all other claims relating to any dealing between any of the parties . . . .

**21.   GUARANTY**

The franchisee below, and if it is an entity, all its officers, directors, partners, and members, agree to perform all the obligations in and relating to this Agreement, including, but not limited to, the obligation to make payments specified herein, pay any other debts due to us, and pay for products later ordered from us.   Likewise, for and in consideration of this Agreement, the signatures of the individual(s) below also constitute their personal joint and several guaranty to perform all the obligations in and relating to this Agreement, including, but not limited to, the obligation to make payments specified herein, pay any other debts due to us, and pay for products later ordered from us.

Compl. Ex. 8 at 11-15.

Pursuant to the franchise agreement, Southwest opened its first Liberty Tax Service office in December, 2001.  Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 9 (Defs.' Resp. Pl.'s Interrogs.), at 17.  Mr. Charon's budget for Southwest's first Liberty Tax Service office reflected that it would prepare 800-850 returns in its first tax season.  Defs.' Mem. Opp'n Mot. Partial Summ. J. Ex. 1 (Charon Dep.), at 261.  Southwest's first Liberty Tax Service office closed the 2002 tax season in May, 2002.  Id. at 22. Southwest's first office prepared 212 tax returns in its first tax

5

season.  Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 9 (Defs.' Resp.
Pl.'s Interrogs.), at 17.  In December, 2002, Southwest opened its
second and third Liberty Tax Service offices.  Id.  In the 2003 tax
season, which closed in May, 2003, Southwest's first office
prepared 234 returns, the second office prepared 72 returns, and
the third office prepared 145 returns.  Id.  Also, during 2003,
Southwest failed to make payments owed to Liberty on eight invoices
totaling $24,013.79 (exclusive of finance charges).  Compl. ¶¶ 14-
15, at 5 & Ex. 9.

On November 10, 2003, Liberty sent notice to Southwest that
Liberty was terminating the franchise agreements based on
Southwest's alleged breach of the agreements.  Id. ¶ 16, at 5.  On
October 4, 2004, Southwest filed a Petition against Liberty in
Texas state court alleging violation of the Texas Deceptive Trade
Practices Act ("TDTPA") (Count I), common law and constructive
fraud (Counts II-V), and negligent misrepresentation (Count VI-
VII).  Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 2.  On January 6,
2005, Liberty moved to dismiss Southwest's Petition based on
section 15(b), the forum selection provision, of each franchise
agreement, which provides that venue is proper only in the U.S.
District Court in Norfolk, Virginia.  Id. Ex. 4.  By order dated
February 14, 2005, the Texas state court granted Liberty's motion
and dismissed Southwest's Petition with prejudice.  Id. Ex. 5.

On February 1, 2005, Liberty filed a Complaint in this court

6

against Southwest alleging one count of breach of the franchise agreements by filing suit in Texas state court (Count I(a)), failing to pay eight invoices totaling $24,013.79 (exclusive of finance charges) (Count I(b)), and failing to adhere to the post-termination non-compete obligations (Count I(c)).[3]  On February 25, 2005, Southwest filed an Answer to Liberty's Complaint and a seven count Counterclaim.[4]  The counts alleged in the Counterclaim are identical to the counts alleged in the Petition that Southwest filed in Texas state court on October 4, 2004.  See Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 2.  On April 13, 2005, this court dismissed with prejudice the negligent misrepresentation counts of the Counterclaim (Counts VI and VII) upon Liberty's motion for judgment on the pleadings, leaving five counts of the Counterclaim in controversy.

On August 10, 2005, Liberty filed a motion and supporting

---

[3] Liberty's Complaint requests the following relief:  (1) hold defendant's joint and severally liable for $400,000.00;  (2) temporarily and permanently enjoin defendants to adhere to the post-termination non-compete duties; (3) award Liberty the costs of pursuing this action; and (4) such other relief as justice may require.  Compl. ¶¶ 1-4, at 6-7.

[4] On each count of the Counterclaim, Southwest requests $334,000.00 in actual damages, interests, and costs.  Countercl. ¶¶ 42, 50, 60, 69, 77 at 10, 11, 13, 15, 16.  Southwest also requests treble damages and recovery for emotional distress on Count I, the TDTPA claim.  Id.  ¶¶ 42, 43, at 10.  Southwest requests punitive damages on Counts II and III, the common law fraud based on misrepresentation and omission claims.  Id. at ¶¶ 51, 61, at 11-12, 13-14.

memorandum for partial summary judgment on the five remaining counts of the Counterclaim and on Count I of the Complaint.  The parts of Count I of the Complaint that are subject to Liberty's partial summary judgment motion are:  Southwest's filing suit in Texas state court (Count I(a)) and Southwest's failure to pay five (5) of the eight (8) unpaid invoices (Count I(b)).[5]  On August 30, 2005, Southwest filed its Memorandum in Opposition to Liberty's Motion for Partial Summary Judgment.  Southwest has not filed a cross motion for summary judgment.  On August 31, 2005, Liberty filed its Reply Memorandum in Support of its Motion for Partial Summary Judgment.  Liberty's motion is now ripe for review.

## II. Standard of Review

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-50 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986); <u>Clark v. Alexander</u>, 85 F.3d 146, 150 (4th Cir. 1996).  The burden on the moving party may be discharged by showing that there is an absence

---

[5] The parts of Count I of the Complaint that are <u>not</u> subject to Liberty's partial summary judgment motion are:  Southwest's failure to pay three (3) of the eight (8) unpaid invoices (Count I(b)), and Southwest's failure to adhere to post-termination non-compete obligations (Count I(c)).

of evidence to support the nonmoving party's case.  Celotex Corp.,
477 U.S. at 325.   To defeat summary judgment, the nonmoving party
must go beyond his own unverified pleadings to show genuine factual
issues for trial.   See id. at 324.

### III. Analysis

#### A.   The Counterclaim

#### 1.   Texas Deceptive Trade Practices Act

Count I of Southwest's Counterclaim alleges that Liberty
violated the Texas Deceptive Trade Practices Act ("TDTPA") by not
complying with the FTC Franchise Rule (the "Franchise Rule"), 16
C.F.R. § 436.1, and by misrepresenting the effectiveness of
advertising expenditures.[6]  Countercl. ¶¶ 35-38, at 8-10.  Liberty
requests summary judgment on Count I arguing that the TDTPA claim
is barred by section 15(a), the choice of law provision, of the
franchise agreements, by section 17, the release provision, of the
franchise agreements, and by the TDTPA's two-year statute of
limitations.   Pl.'s Mem. Supp. Mot. Partial Summ. J. at 11-12;
Pl.'s Reply Mem. Supp. Mot. Partial Summ. J. at 14 n.6.

Liberty's principal argument for summary judgment on this

---

[6]  Southwest's Counterclaim also alleges that Liberty
misrepresented that an individual experienced in site selection
would assist Southwest in locating the site for its Liberty Tax
Service office.  Countercl. ¶ 36, at 8-9.  Southwest's response to
Liberty's interrogatories does not assert this site selection
misrepresentation as a basis for Southwest's fraud or TDTPA claims.
Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 9 (Defs.' Resp. Pl.'s
Interrogs.), at 7-10.

count is that the TDTPA claim is barred by section 15(a) in each of the franchise agreements, which provides that "Virginia law governs all claims which in any way relate to or arise out this Agreement or any of the dealings of the parties hereto." Compl. Ex. 8, at 14.  Southwest argues that section 15(a) does not bar a TDTPA claim because the TDTPA contains an anti-waiver section.  Defs.' Mem. Opp'n Mot. Partial Summ. J. at 13.  The anti-waiver section of the TDTPA provides that any waiver by a consumer of the provisions of the TDTPA is contrary to public policy, unenforceable, and void, unless the following requirements are satisfied:  the waiver is in writing and is signed by the consumer; the waiver is identified by the heading "Waiver of Consumer Rights" and satisfies certain content specifications; the consumer is not in a significantly disparate bargaining position; and the consumer is represented by legal counsel.  See Tex. Code Ann., Bus. & Com. § 17.42 (2002).

Under Virginia choice of law principles, which a federal court sitting in Virginia and exercising its diversity jurisdiction must apply, see Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941), contractual choice of law provisions are given full effect except under exceptional circumstances.  See Tate v. Hain, 25 S.E.2d 321, 324 (Va. 1943).  Exceptional circumstances recognized under Virginia law are circumstances in which there is no reasonable basis for the parties' choice of law or where consent to the provision was obtained by improper means, such as fraud or

duress.  See id.; Hooper v. Musolino, 364 S.E.2d 207, 211 (Va. 1988).  The party challenging the validity of the provision bears the burden of establishing exceptional circumstances.  See Paul Bus. Sys., Inc. v. Canon U.S.A., Inc., 397 S.E.2d 804, 808 (Va. 1990).

Southwest essentially argues that the anti-waiver section of the TDTPA is an exceptional circumstance rendering section 15(a) of the franchise agreements unenforceable to the extent that section 15(a) prevents Southwest from raising a TDTPA claim.[7]  The

_____

[7] Southwest does not contend that the choice of Virginia law is unreasonable.  The fact that Liberty's headquarters and principal place of business is in Virginia is sufficient connection to Virginia to support a choice of law provision designating Virginia as the law governing the agreements.  See Global One Communications, LLC. v. Ansaldi & NTT Am., Inc., No. C165948, 2000 WL 1210511, at *2 (Va. Cir. Ct. May 5, 2000) (holding that under Virginia choice of law principles plaintiff's incorporation in Delaware is sufficient connection to support a Delaware choice of law provision).

Southwest does argue that, to the extent that section 15(a) waives Southwest's rights under the TDTPA, the provision is the product of unequal bargaining power.  Defs.' Mem. Opp'n Mot. Partial Summ. J. at 14.  While unequal bargaining power is a factor that the court may consider in assessing the validity of a choice of law provision, that factor alone is not dispositive.  See Wellmore Coal Corp. v. Gates Learjet Corp., 475 F. Supp. 1140, 1144 (W.D. Va. 1979).  The RISK FACTORS section of the July 2000 and July 2001 Offering Circulars, received by Southwest prior to its execution of the franchise agreements, warned Southwest in bold type that "THIS FRANCHISE AGREEMENT DECLARES THAT VIRGINIA LAW GOVERNS THIS AGREEMENT.  VIRGINIA LAW MAY NOT PROVIDE YOU THE SAME PROTECTIONS THAT YOUR STATE LAW PROVIDES . . . ."  Pl.'s Mem. Supp. Mot. Partial Summ. J. at Exs. 6-7.  The franchise agreements each included section 15(a), the choice of law provision, entitled "Virginia Law."  Compl. Ex. 8, at 14.  The choice of law provision is in the same size print as the remainder of the agreement and the paragraph is labeled in boldface as "GOVERNING LAW."  Id.  Mr. Charon acknowledged receiving the July, 2000, and July, 2001,

franchise agreements at issue here do not contain a waiver that complies with the requirements set forth in the TDTPA to avoid the effect of the anti-waiver section.  <u>See</u> Tex. Code Ann., Bus. & Com. § 17.42.[8]  The parties cite opinions from other courts, applying other states' choice of law principles, to hold that similar anti-waiver provisions either do or do not render contractual choice of law provisions invalid.  Defs.' Mem. Opp'n Mot. Partial Summ. J. at 15-18; Pl.'s Reply Mem. Supp. Mot. Partial Summ. J. at 15-16.[9]  To

---

Offering Circulars.  Pl.'s Mem. Supp. Motion Partial Summ. J. Ex. 8.  Mr. Charon admitted reading and signing the franchise agreements.  <u>Id.</u> Ex. 1 (Charon Dep.), at 175, 177.  Mr. Charon has not presented evidence of unequal bargaining power sufficient to render the provision unenforceable on that ground.

[8] If the TDTPA waiver section were not at issue, the language of section 15(a) is broad enough to include the omission and misrepresentation that form the basis of Southwest's TDTPA claim because the omission and misrepresentation arise out of and relate to the agreements and the dealings between the parties.  <u>See</u> <u>Hitachi Credit Am. Corp., v. Signet Bank</u>, 166 F.3d 614, 624, 628 (4th Cir. 1999) (holding that a choice of law provision providing that Virginia law governs "this agreement and the rights and obligations of the parties hereunder . . . including all matters of construction, validity, and performance" is broad enough to include fraud claims based on misrepresentation and omission); <u>Freedman v. Am. Online, Inc.</u>, 325 F. Supp. 2d 638, 653 (E.D. Va. 2004) (holding that a Virginia choice of law provision in an internet service agreement is valid, the language of the provision is sufficiently broad to encompass the acts giving rise to plaintiff's Connecticut Unfair Trade Practices Act claim, and, therefore, Virginia substantive law governs the claim and plaintiff may not state a claim under Connecticut statutory law).

[9] In <u>Carlock v. Pillsbury Co.</u>, cited by Liberty, the District of Minnesota applied Minnesota choice of law principles to assess the validity of a New York contractual choice of law provision and held that under Minnesota law the choice of law provision was valid and would bar claims brought under the Minnesota Franchise Act.

date, no court applying Virginia choice of law principles has

addressed and decided whether an anti-waiver provision like § 17.42

of the TDTPA is an exceptional circumstance rendering a contractual

choice of law provision unenforceable.[10] _____

_____It is unnecessary for the court to decide the issue in this

case, because even assuming that the TDTPA claim can be brought,

the TDTPA claim is barred by the TDTPA's two-year statute of

---

719 F. Supp. 791, 808-10 (D. Minn. 1989).  The Carlock court held
that the choice of law provision barred claims brought under the
Minnesota Franchise Act, even though the Minnesota Franchise Act
contains an anti-waiver provision, which voids any provision
purporting to waive the Act's protections. Id. at 810.  In Bakhico
Co. Ltd. v. Shasta Beverages, Inc., cited by Southwest, the
Northern District of Texas applied Texas law to assess the validity
of a Virginia contractual choice of law provision and held that
under Texas choice of law principles the choice of Virginia law is
invalid.  No. CIV. 3:94-CV-1780-H, 1998 WL 614647 (N.D. Tex. Sept.
3, 1998) (applying the Restatement (Second) of Conflict of Laws
approach to assessing the validity of a contractual choice of law
provision).  The Bakhico court then held that under Texas law, and
the anti-waiver section of the TDTPA, the contract's limitation on
liability clause is unenforceable.  Id. at *5.

[10] In Brock v. Entre Computer Ctrs., Inc., cited by Liberty, the
Fourth Circuit held that it "need not address whether the releases
violate the Texas DTPA" because it determined that the choice of
law provision in the parties' agreement is broad enough to include
the TDTPA claim, and pursuant to the provision, Virginia law
governs the claims.  933 F.2d 1253, 1260 (4th Cir. 1991).  The
anti-waiver section of the TDTPA was in effect at the time of the
Brock decision, but the Fourth Circuit did not address the effect
of the anti-waiver section. See id.  In Silver v. JTH Tax, Inc.,
a case involving a Liberty Tax Service franchise agreement with an
identical section 15(a) choice of law provision, this court assumed
without deciding that the anti-waiver provision in the New York
Franchise Sales Act ("NYFSA") rendered section 15(a) unenforceable,
to the extent that it barred claims under the NYFSA.  No. Civ.A.
2:05CV126, 2005 WL 1668060, at *4 (E.D. Va. June 21, 2005).

limitations.  The TDTPA provides that all actions brought under the TDTPA "must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice." Tex. Code Ann., Bus. & Com. § 17.565 (1987).  Thus, the TDTPA provides two alternatives for determining the accrual date of the TDTPA cause of action.  Under the normal rule, the cause of action accrues on the date on which the false, misleading, or deceptive act or practice occurred.  Dick Poe Motors, Inc., v. Dickey, 802 S.W.2d 739, 744 (Tex. App. 1990).  If the cause of action is not brought within two years of the occurrence of the false, misleading, or deceptive act or practice, the action is barred.  Id.

Actions otherwise barred under the normal rule may nevertheless be timely under the second alternative for determining the accrual date, known as the "discovery rule."  Id.  Under the discovery rule, the cause of action does not accrue until the complainant discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice. S.W. Bell Media, Inc., v. Lyles, 825 S.W.2d 488, 492 (Tex. App. 1992).  The discovery rule is a "limited exception" to the statute of limitations and is applied only "when the nature of the injury is inherently undiscoverable."  J.M.

14

Krupar Constr. Co., Inc. v. Rosenberg, 95 S.W.3d 322, 329 (Tex. App. 2002) (equating the discovery rule to the doctrine of fraudulent concealment, under which the limitations period is tolled until the fraud is discovered or could have been discovered with reasonable diligence).  To be inherently undiscoverable, the injury must be unknown by nature and not by any fault of the complainant. Hunton v Guardian Life Ins. Co. of Am., 243 F. Supp. 2d 686, 698, 703-04 (S.D. Tex. 2002) (holding that the discovery rule did not apply to plaintiffs' TDTPA claim because the plaintiffs would have discovered the alleged falsity of the statements during the limitations period if they had exercised reasonable diligence). Under Texas law, the complainant must plead the discovery rule "either in its original petition or in any amended or supplemental petition" in response to the opposing party's assertion of the statute of limitations as a defense. Woods, C.R.N.A., v. William M. Mercer, Inc., 769 S.W.2d 515, 518 (Tex. 1989) (holding that if the discovery rule is not raised affirmatively by the pleadings, it will be deemed waived); Pirtle v. Kahn, No. 01-04-00147-CV, 2005 WL 1991780, at *3 (Tex. App. Aug. 18, 2005) (noting that if the complaining party pleads the discovery rule and adduces summary judgment evidence raising a fact issue in avoidance of the statute of limitations, the opposing party moving for summary judgment must then negate the fact issue).

The Franchise Rule provides that it is an unfair or deceptive

15

act or practice within the meaning of section 5 of the Federal

Trade Commission Act for any franchisor to make:

> any oral, written, or visual representation to a prospective
> franchisee which states a specific level of potential sales,
> income, gross or net profit for that prospective franchisee,
> or which states other facts which suggest such a specific
> level, unless: . . . (3) such representation is set forth in
> detail along with the material bases and assumptions therefor
> in a single legible written document whose text accurately,
> clearly and concisely discloses such information . . . .

16 C.F.R. § 436.1 (b)(3) (2005).  The Franchise Rule provides that

this written document must be furnished "no later than the 'time

for making of disclosures.'"   Id.   The "time for making

disclosures" is ten (10) business days prior to the earlier of the

prospective franchisee's execution of a franchise agreement or

payment of consideration in connection with the sale of a

franchise.  16 C.F.R. § 436.2(g) (2005).  If the representations

are made at a "personal meeting," which is a face-to-face meeting

between a franchisor and a prospective franchisee held for the

purpose of discussing the possible sale of a franchise, then the

document must be furnished at the "personal meeting."  16 C.F.R. §

436.1 (b)(3); 16 C.F.R. § 436.2(o) (2005).

If Liberty's failure to furnish Southwest with written

document(s) setting forth Mr. Stuver's and Mr. Hewitt's

representations and material bases and assumptions therefor is a

false, misleading, or deceptive act as Southwest contends, then,

under the Franchise Rule, that false, misleading, or deceptive act

occurred on the date that the document(s) should have been

furnished.  Under the Franchise Rule, the document(s) should have
been furnished no later than August 31, 2001, ten (10) business
days prior to the September 14, 2001, execution of the franchise
agreements.  <u>See</u> 16 C.F.R. § 436.2 (g).  Accordingly, under the
normal rule for determining the accrual of the cause of action, the
action accrued on August 31, 2001, and was barred on August 31,
2003.

Liberty raised the statute of limitations as an affirmative
defense in its March 10, 2005, Reply to Counterclaim and in its
March 23, 2005, Amended Reply to Counterclaim.  Reply Countercl. at
7;  Am. Reply Countercl. at 8.  Southwest did not plead the
discovery rule as a matter in avoidance of the TDTPA statute of
limitations in its Counterclaim, and it has not amended or
supplemented it Counterclaim.  Southwest did not plead the
discovery rule in its discussion of its TDTPA claim in its
Memorandum in Support of Opposition to Liberty's Motion for Partial
Summary Judgement.[11]  <u>See</u> Defs.' Mem. Opp'n Mot. Partial Summ. J.
at 13-19.  Therefore, Southwest has not pled the discovery rule or
adduced summary judgment evidence raising a fact issue in avoidance
of the TDTPA statute of limitations.  Accordingly, Southwest's
TDTPA claim accrued on August 31, 2001, the date by which Liberty

---

[11] Southwest does not contend that its failure to timely
commence this action was caused by Liberty's "knowingly engaging in
conduct solely calculated to induce the plaintiff to refrain from
or postpone the commencement of the action."  Tex. Code Ann., Bus.
& Com. § 17.565.

should have furnished the document(s), and the TDTPA claim was barred by August 31, 2003.

If Liberty's alleged misrepresentation regarding the effectiveness of advertising expenditures is cognizable as a false, misleading, or deceptive act under the TDTPA, Southwest's response to Liberty's interrogatories and Mr. Charon's deposition testimony establishes that the representation occurred on June 23, 2001.[12] Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 9 (Defs.' Resp. Pl.'s Interrogs.), at 7; Defs.' Mem. Opp'n Mot. Partial Summ. J. Ex. 1 (Charon Dep.), at 129. Liberty raised the statute of limitations as an affirmative defense in its March 10, 2005, Reply to Counterclaim and its March 23, 2005, Amended Reply to Counterclaim. Reply Countercl. at 7; Am. Reply Countercl. at 8. Southwest has not pled the discovery rule as a matter in avoidance of the TDTPA statute of limitations. Accordingly, Southwest's TDTPA claim based on Liberty's alleged misrepresentation regarding the effectiveness of advertising expenditures was barred by June 23, 2003.

---

[12] To the extent that Southwest's TDTPA claim is based on Liberty's representation that an individual experienced in site selection would assist Southwest in selecting its office site, that representation must have occurred before Liberty sent an inexperienced individual to assist Southwest in site selection. See Countercl. ¶ 36, at 8-9. Liberty must have sent the inexperienced individual before December, 2001, the date on which Mr. Charon stated in deposition that he signed the lease and started improvements at his first Liberty office site. Defs.' Mem. Opp'n Mot. Partial Summ. J. Ex. 1 (Charon Dep.), at 211. Therefore, the misrepresentation had to have occurred by December, 2001. Accordingly, any TDTPA claim based on this misrepresentation would have been barred by December, 2003.

## 2.   Fraud

Counts II and IV of the Counterclaim are claims of actual and constructive fraud based on misrepresentations of fact occurring in the summer of 2001. The representation that Southwest claims is false is Mr. Hewitt's statement at the June 22-23, 2001, franchise sales meeting that a first year Liberty franchisee can expect to prepare tax returns equal to 40% of the nearest H&R Block office, if the franchisee follows the Liberty system.[13] Countercl. ¶¶ 46, 64, at 10-11, 14. Counts III and V are claims of actual and constructive fraud based on omission of material fact. The omission on which Southwest's fraudulent omission claims are based is Liberty's failure to furnish document(s) allegedly required by the

---

[13] The other alleged "misrepresentations" made by Liberty, detailed supra at 2-3, all relate to Southwest's calculation that its first Liberty Tax Service office would complete 800-850 tax returns in its first tax season. Based on Mr. Hewitt's statement that franchisees should count the number of desks in various H&R Block offices and assume that each desk accounts for 300-400 tax returns, Mr. Charon counted the number of desks in the H & R Block office nearest Southwest's Liberty Tax Service office and determined that the nearest H & R Block office prepared 4,800 returns. Defs.' Mem. Opp'n Mot. Partial Summ. J. Ex. 1 (Charon Dep.), at 155-56, 164. Mr. Charon recognized that 4,800 was higher than the 2,000 paid returns that Mr. Hewitt had stated was the average number of returns prepared in H & R Block offices per territory. Id. at 22; id. Ex. 1 (Charon Dep.), at 164. Mr. Hewitt had stated that a first year Liberty franchisee can expect to prepare tax returns equal to 40% of the nearest H & R Block office, if the franchisee follows the Liberty system. Id. Ex. 1 (Charon Dep.), at 164. Wanting to be conservative in his estimate of the number of returns that his first Liberty Tax Service office would complete, Mr. Charon calculated 40% of 2,000, and, thus, arrived at the 800 figure. Id.

Franchise Rule, 16 C.F.R. § 436.1.[14]  Id. at ¶¶ 54, 71, at 12, 15;
Defs.' Mem. Opp'n Mot. Partial Summ. J., at 28 ("Counts III and IV
of Southwest's Counterclaim allege fraud and constructive fraud,
respectively, based on cross-defendant's failure to disclose
information that it had a duty to disclose pursuant to 16 C.F.R. §
436.1 [the Franchise Rule]").

Liberty requests summary judgment on each fraud count of the
Counterclaim arguing that the claims are barred by Virginia's two-
year statute of limitation for fraud, Pl.'s Mem. Supp. Mot. Partial
Summ. J. at 12-14; and by section 17, the release provision, of the
franchise agreements, id. at 26-27; and the claims fail as a matter
of law because the alleged statements and omissions are not of
present, existing fact and Southwest could not have reasonably
relied on the statements and omissions, id. at 14-26.  The court
finds that Southwest's fraud claims are barred by Virginia's two-
year statute of limitations for fraud.

---

[14] The fraudulent omission claims are based on Liberty's
failure to furnish documents allegedly required by the Franchise
Rule in relation to the following statements: 1) Mr. Hewitt's June
23, 2001, statement that first year franchisees could expect to
complete 40% of the returns of the nearest H&R Block office; 2) Mr.
Hewitt's June 23, 2001, statement regarding the number of returns
a franchisees could assume each H&R Block desk completed; 3) Mr.
Stuver's May, 2001, and June 23, 2001, statements regarding the
number of tax returns that he completed in his Liberty franchise;
and 4) Mr. Stuver's July, 2001, statements detailing the average
revenue and expense per return completed in his Liberty franchise.
Pl.'s Mem. Supp. Mot. Partial Summ. J. ¶¶ 34-35 at 9-10; Defs.'
Mem. Opp'n Mot. Partial Summ. J. at 1-2.

Section 8.01-243 of the Virginia Code provides that "every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues".  Va. Code Ann. § 8.01-243(A) (1987).  Under section 8.01-249, a cause of action for fraud accrues when such fraud "is discovered or by the exercise of due diligence reasonably should have been discovered."  Va. Code Ann. § 8.01-249 (2005).  Similar to the TDTPA statute of limitations, the Virginia statute of limitations for fraud provides two alternatives for determining the accrual date.  Under the normal rule, the cause of action accrues when the complainant discovered the fraud.  See id.  Discovery does not occur when the complainant professes to have discovered the fraud.  See Pigott v. Moran, 341 S.E.2d 179, 182 (Va. 1986).  Rather, discovery occurs when the complainant receives information indicating the possibility of fraud.  See id. (holding that discovery of the alleged fraud manifestly occurred when complainants received information indicating that the representation was false and not, as the complainants argued, when the information received was confirmed to be accurate); Virginia Imps., Inc., v. Kirin Brewery of Am., LLC., 296 F. Supp. 2d 691, 700 (E.D. Va. 2003) (holding that the cause of action for fraud accrues when the complainant is on notice of the possibility of fraud and not when the alleged scheme is completely exposed).  Under the discovery rule, the second alternative for determining the accrual date, if the true nature of the fraudulent act or omission is concealed,

accrual will not occur until the fraud should have been discovered in the exercise of due diligence.   See STB Mktg. Corp. v. Zolfaghari, 393 S.E.2d 394, 396 (Va. 1990).   Whether the complainant exercised due diligence to discover the fraud may be determined at the summary judgment stage.   Virginia Imps. Inc., 296 F. Supp. 2d at 699.

Southwest has pled the discovery rule in defense to Liberty's assertion that Southwest's fraudulent misrepresentation claims are barred by Virginia's two-year statute of limitations for fraud. Defs.' Mem. Opp'n Mot. Partial Summ. J. at 23-24.   Southwest contends that it did not discover the fraudulent nature of Mr. Hewitt's statement that first year franchisees could expect to prepare 40% the number of tax returns of the nearest H & R Block office until May, 2003, when Southwest's second and third Liberty Tax Service offices prepared low numbers of returns.   Id.   However, Mr. Charon's July 12, 2005, deposition testimony establishes that discovery of the falsity of Mr. Hewitt's statement regarding the number of tax returns that a first year franchisee could expect to complete in its first year manifestly occurred in May, 2002, following the close of Southwest's first tax season operating a Liberty Tax Service office.   Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 1 (Charon Dep.), at 260-62.   Specifically, Mr. Charon admits that at the close of the first tax season, he knew that his first Liberty Tax Service office had not reached the 40% mark.   Id. ("Q. at the end of your first tax season, you knew that you hadn't hit

22

that 40% correct?  A.  Oh, yes.").[15]   Mr. Charon's notice of the possibility of the falsity of Mr. Hewitt's statement is further buttressed by Mr. Charon's deposition testimony that in the summer of 2002 he talked with other Liberty franchisees in the Dallas/Fort Worth area about the number of tax returns that they completed in the 2002 tax season.  Defs.' Mem. Opp'n Mot. Partial Summ. J. Ex. 1 (Charon Dep.), at 264.  Mr. Charon stated in deposition that his Liberty Tax Service office's low tax return numbers were "in line" with some of the other franchisees.  Id.  Southwest has not alleged that Liberty concealed the falsity of Mr. Hewitt's representation. Therefore, discovery occurred in May, 2002, when Southwest received notice of the possibility of fraud.  Discovery did not occur, as Southwest argues, in May, 2003, when Southwest's three Liberty Tax Service offices prepared low numbers of returns, confirming that the low numbers prepared by the first office in its first tax season was not an anomaly.  Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 9 (Defs.' Resp. Pl.'s Interrogs.), at 17; see Pigott, 341 S.E.2d at 182.   Accordingly, Southwest's fraud claims based on

---

[15] In fact, Mr. Charon knew that his first Liberty Tax Service office had prepared dramatically fewer tax returns than Mr. Charon had expected it would prepare.  Based on Mr. Hewitt's representation that franchisees could prepare 40% the number of returns prepared by the nearest H &R Block office in their first year, Mr. Charon "was hoping" that Southwest's Liberty franchise would complete 800-850 tax returns.  Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 1 (Charon Dep.), at 260.  Yet, in May, 2002, at the close of Southwest's first tax season operating a Liberty Tax Service office, the office had only prepared 212 returns.  Id. Ex. 1 (Charon Dep.), at 260-261. The 212 prepared is roughly seventy-five (75) percent fewer returns than the 800-850 expected.

misrepresentation are barred by the statute of limitations.

Southwest has not pled the discovery rule in defense to Liberty's assertion that Southwest's fraudulent omission claims are barred by Virginia's two-year statute of limitations for fraud. <u>See</u> Defs.' Mem. Opp'n Mot. Partial Summ. J. at 24. In a footnote in Southwest's Memorandum in Opposition to Liberty's Motion for Partial Summary Judgment, Southwest states that the discovery rule defense does not apply to Mr. Stuver's earnings claims, because Southwest was not on notice that Mr. Stuver's earning claims were unlawful until Southwest consulted with its attorney in 2004. Defs.' Mem. Opp'n Mot. Partial Summ. J. at 24 n.7. Southwest argues that Mr. Stuver's earnings claims were unlawful because Franchise Rule document(s) were not provided to substantiate those claims. <u>Id.</u> at 31. Accordingly, Southwest seems to contend that it did not discover the Franchise Rule document(s) had not been furnished until 2004 because Mr. Charon had no background in franchising or franchise law and thus did not know that the Franchise Rule may have required Liberty to furnish documents. <u>Id.</u> at 24 n.7.

As discussed <u>supra</u> Section III.A.1, if Liberty was required to furnish Franchise Rule documents, and Liberty's failure to furnish such documents could form the basis of a fraud claim, then the omission occurred by August 31, 2001, the date by which the Franchise Rule would have required the documents to be furnished. Southwest cannot avoid discovery by asserting ignorance of the law. Knowledge of the law was not concealed and could have been acquired

24

at any time before or after the Franchise Rule documents would have been required to be furnished.  Furthermore, a businessman entering into an agreement for the purchase and operation of a franchise, should have a duty to investigate the law regarding the purchase and operation of the franchise.  See Bailey v. Grass, Nos. LP-2758-1, LM-2731-4, 2004 WL 3000944, at *2 (Va. Cir. Ct. June 24, 2004) (holding that due diligence required the purchaser of an existing business that derived revenue from Medicaid to read the financial statement provided by the seller at the time of the closing and to know and understand the law regarding this revenue source).  Therefore, Southwest is charged with discovery that Liberty had not furnished Franchise Rule documents around the time that the documents would have been required to be furnished.  Accordingly, Southwest's fraud claims based on failure to furnish Franchise Rule documents are barred by Virginia's two-year statute of limitations.

## B.   The Complaint

### 1.   Attorneys' Fees

Liberty requests summary judgment on Count I(a) of its Complaint alleging breach of the forum selection provision of the franchise agreements and an award of damages in the amount of $9,718.52, the amount of attorneys' fees Liberty expended to defend the suit that Southwest brought in Texas state court.[16]  Southwest

---

[16] Deborah S. Coldwell, counsel for Liberty in the Texas action, by affidavit dated August 9, 2005, attached to Liberty's Memorandum in Support of its Motion for Partial Summary Judgment, states that Liberty has incurred $9,718.52 in legal fees.  Pl.'s Mem. Mot.

does not dispute that it brought suit in Texas state court and that bringing suit in Texas court was in contravention of the provision. Southwest does not contest the amount of damages claimed.

Southwest does argue that fraud renders the forum provision voidable. Defs.' Mem. Opp'n Mot. Partial Summ. J. at 36. This argument must fail because, as discussed supra Section III.A.1-2, Southwest's fraud and TDTPA claims are barred by the applicable statutes of limitations. Alternatively, Southwest contends that Liberty is not entitled to damages under Virginia law for breach of a forum selection provision. Id. at 37. The court finds that Liberty is entitled to damages for breach of the forum selection provision and grants Liberty's motion for summary judgment on this count and awards damages in the amount of $9,718.52. See Tasteful Treasures, Inc. v. Wiethorn, No. CH04-1239 (Vir. Cir. Ct. June 21, 2004) (awarding attorneys fees for defendant's breach of the contractual forum selection clause).[17]

---

Partial Summ. J. Caldwell Aff. This amount is in conflict with the yet unproven "Factual Contentions" in the Final Pretrial Order, which states that Liberty has incurred $10,575.15 in legal fees. Final Pretrial Order, at 24. The court, however, uses the uncontested lower amount in the attorney's sworn affidavit.

[17] In Wells v. Entre Computer Ctrs., an unpublished case decided in 1990, the Fourth Circuit declined to award the plaintiff damages for breach of a forum selection clause, reasoning that neither the plaintiff nor the court was aware of a case that had awarded such damages. Nos. 89-2342, 89-2352, 1990 WL 146981 (4th Cir. Oct. 5, 1990). This court is aware of four cases since Wells in which a court has either awarded damages for breach of a forum selection clause or held that such damages could be recoverable. See Omrom Healthcare, Inc. v. Maclaren Exps. Ltd., 28 F.3d 600, 604 (7th Cir. 1994) (suggesting that plaintiff could have sought damages for

2.   Invoices

Liberty requests partial summary judgment on Count I(b) of the Complaint, which alleges that Southwest breached section 21, the Guaranty provision, of the franchise agreements by failing to pay eight invoices totaling $24,013.79 (exclusive of finance charges). Compl. ¶ 19(b), at 6.  Liberty requests partial summary judgment on five outstanding invoices, totaling $13,375.79 (exclusive of finance charges), that Southwest does not contest.  Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 9 (Defs.' Resp. Pl.'s Interrogs.), at 15-16 (interrogatory response contesting Southwest's obligation to pay three of the eight invoices) & Ex. 10, at 8-9 (admission that the eight invoices had not been paid).

Southwest argues that Liberty is not entitled to summary judgment on the five (5) uncontested invoices because fraud renders the franchise agreements voidable.  Defs.' Mem. Opp'n Mot. Partial Summ. J. at 36.  This argument must fail because, as discussed supra Section III.A.1-2, Southwest's fraud and TDTPA claims are barred by the applicable statutes of limitations.  Accordingly, Liberty's motion for partial summary judgment on the five uncontested invoices

---

breach of a forum selection clause); Lab. Corp. of Am. v. Upstate Testing Lab., Inc., 967 F. Supp. 295, 299 (N.D. Ill. 1997) (holding that plaintiff has a right to enforce the forum selection clause and recover damages for its breach); Indosuez Int'l Fin., B.V., v. Nat'l Reserve Bank, 758 N.Y.S.2d 308, 311 (N.Y. App. Div. 2003) (holding that "damages may be obtained for breach of a forum selection clause"); Tasteful Treasures, Inc. v. Wiethorn, No. CH04-1239 (Vir. Cir. Ct. June 21, 2004) (awarding attorneys fees for defendant's breach of a contractual forum selection clause).

is granted.

## IV. Conclusion

For the reasons set forth above, the plaintiff's motion for summary judgment on Count I through Count V of the Counterclaim is **GRANTED**. As a result of this ruling, no portion of the Counterclaim remains in controversy. In addition, for the reasons set forth above, the plaintiff's motion for partial summary judgment on Count I of the Complaint is **GRANTED**, and plaintiff is awarded $9,718.52 on Count I(a) and $13,375.79 on Count I(b), for a total damage award on Count I of $23,094.31. The following portions of Count I of the Complaint remain in controversy: Count I(b) alleging Southwest breached section 21, the guaranty provision, of the franchise agreements by failing to pay the three invoices contested by Southwest that total $10,638.00 (exclusive of finance charges), and Count I(c) alleging Southwest breached section 10(b), the covenant not to compete provision, of the franchise agreements, for which no specific amount is claimed. The Clerk is **DIRECTED** to enter partial judgment for the plaintiff in accordance with this Opinion and Order, and to send a copy of this Opinion and Order to counsel for plaintiff and defendant.

**IT IS SO ORDERED.**

/s/Rebecca Beach Smith
_____
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
October 26, 2005

28